**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

**No. 97-40542**

---

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**v.**

**CARLOS OTERO, a.k.a. CHARLIE, a.k.a. CHARLIE OTERO;
JUAN RODRIGUEZ, a.k.a. JOHNNY RODRIGUEZ, a.k.a. JOHNNY;
GUSTAVO B. ANDRADE; and
AUGUSTIN JAIME OBREGON-GONZALEZ, a.k.a. JAIME OBREGON,**

**Defendants-Appellants,**

---

**Appeals from the United States District Court
for the Southern District of Texas
(B-96-CR-337)**

---

March 5, 1999

Before KING, Chief Judge, JONES, and SMITH, Circuit Judges:

PER CURIAM:[*]

Carlos Otero, Juan Rodriguez, Gustavo Andrade, and Augustin Jaime Obregon-Gonzalez were convicted by a jury on various charges relating to the importation and possession of marijuana. On appeal, the appellants have raised numerous issues in connection with their convictions. Finding no error in the pretrial, trial, or sentencing proceedings, we affirm.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

## I.    FACTUAL AND PROCEDURAL HISTORY

### A.    *The Conspiracy*

In August 1996, the appellants contacted a confidential informant for the United States Customs Service to arrange for the transportation of marijuana between the Rio Grande Valley of Texas and Chicago, Illinois.  After agreeing with Andrade and Hilario Obregon to transport the marijuana for $50,000, the informant scheduled an appropriate date to pick up the shipment.

From August 29 to September 2, 1996, the informant, an undercover officer, and the appellants worked to gather, load, and store the marijuana shipment.  On August 29, Obregon-Gonzales and Obregon assisted the informant in loading marijuana into a van ("the August 29 load").[1]  On August 30, the undercover officer drove the van to Rodriguez's grocery store where he met Obregon-Gonzales, Andrade, and Rodriguez.  More marijuana was loaded in the van ("the August 30 load"), and the undercover officer was given money orders in the amount of $5,350 -- a down payment on the $50,000.  On August 31, the undercover officer met with Obregon-Gonzales, Andrade, and Rodriguez to receive the final shipment of marijuana.  To their chagrin, the United States Border Patrol seized this shipment as it was crossing the border from Mexico.

On September 2, Andrade, Obregon, and Obregon-Gonzales met with the undercover officer at a warehouse where the marijuana

---

[1]    Initially, the parties had planned to pick up the August 29 load at Rodriguez's grocery store.  These plans ultimately fell through, however, and the August 29 load was stowed on board the van at a house in El Ranchito, Texas.

had been stored.  An additional $6,000 was delivered, and the parties argued regarding the total amount of marijuana included in the shipment.  Later that day, the undercover officer met with Andrade, received an additional $3,000 in money orders, and finalized plans for transporting the marijuana, including instructions for delivering the contraband to "Charlie" in Chicago.

Following the transportation of the marijuana to Chicago, the undercover officer contacted Charlie, a.k.a. Otero.  The undercover officer discussed delivery arrangements with Otero and Andrade, who had been accompanied to Chicago by Obregon-Gonzales. Final payment was arranged through the informant by wiring $25,000 from Mexico to a bank in Brownsville, Texas.  After the informant confirmed receipt of the money on September 9, the undercover officer delivered the marijuana to Andrade and Otero at a hotel. Andrade and Otero left with the marijuana in a Ryder truck.  An Illinois state trooper working with the Customs Service stopped the vehicle.  When searched, the marijuana was found in the cargo bay.

B.  *The Indictment and Convictions*

Rodriguez, Andrade, Otero, Obregon-Gonzales, and Obregon[2] were indicted by a federal grand jury for conspiracy to import in excess of 100 kilograms of marijuana, 21 U.S.C. §§ 952(a), 960(b)(2), 963; conspiracy to possess with intent to distribute in excess of 100 kilograms of marijuana, 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 846; and conspiracy to launder money, 18 U.S.C. §

---

[2]    Obregon was indicted with the appellants; however, he died prior to trial.

1956(h).  Rodriguez, Andrade, Obregon-Gonzales, and Obregon were also charged with possession, and aiding and abetting possession, with intent to distribute in excess of 100 kilograms of marijuana, 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 18 U.S.C. § 2.

The defendants were tried together.  Otero filed a motion to sever, which the trial court denied.  Rodriguez's oral motion for severance, made during pretrial proceedings, was also denied.  Neither the record nor trial transcripts indicate that Andrade filed a pretrial motion to sever.  The appellants timely appealed their convictions.

**II.  ANALYSIS**[3]

*A.    Sufficiency of the Evidence*

Viewed in the light most favorable to the verdict, the evidence was sufficient to support the convictions of Obregon-Gonzalez, Otero, and Rodriguez for conspiracy to import marijuana, conspiracy to possess with intent to distribute marijuana, and possession with intent to distribute marijuana.  See United States v. Sanchez, 961 F.2d 1169, 1173 (5th Cir. 1992) (explaining standard for sufficiency of evidence review).  In fact, factual support for the convictions is sprinkled liberally throughout the record.

First, the sole basis for Obregon-Gonzalez's sufficiency challenge (i.e., that he lacked the requisite intent because he was

_____

[3]    In some cases, more than one of the appellants raises the arguments we address.  It is unnecessary, however, to specify the proponent of each of the issues, and we will respond to their arguments together.

acting as an agent of the government) was heard by the jury and rejected. We will not upset this credibility determination on appeal. See United States v. Kelley, 140 F.3d 596, 607 (5th Cir. 1998) ("We will not supplant the jury's determination of credibility with that of our own." (internal punctuation omitted)).

The actions of Otero and Rodriguez, with respect to the narcotics conspiracies, showed a clear concert of action from which a jury could infer the existence of a conspiracy for each count. See United States v. Cardenas, 9 F.3d 1139, 1157 (5th Cir. 1993) ("An agreement to violate narcotics laws may be inferred from 'concert of action.'"). Direct and circumstantial evidence linked each of the appellants to the entire conspiracy from the importation stage,[4] to the loading of the drugs,[5] to delivery of the drugs to Chicago,[6] and to payment and transportation following delivery. Under these circumstances a jury could have readily found that each of the appellants conspired to import marijuana

---

[4] A portion of the drugs intended to be loaded at Rodriguez's grocery store was seized by the Border Patrol. Moreover, on September 2, 1996, Andrade discussed the extent of the conspiracy's operation in Mexico with the undercover officer.

[5] Most of the loading was accomplished, or was meant to be accomplished, at Rodriguez's grocery store. This evidence not only supports the appellants' conspiracy convictions, but it buttresses Rodriguez's conviction for possession of the August 29 load with intent to distribute. Though the original plan to transfer the August 29 load at the grocery store failed, Rodriguez's attachment to this load was revealed when Obregon-Gonzalez told the undercover officer that Johnny, a.k.a. Rodriguez, calculated the entire load at 1300 pounds of marijuana, the approximate total of both the August 29 and 30 loads.

[6] Otero was clearly linked to each of the narcotics conspiracies, including the conspiracy to import, as the Chicago contact for the undercover officer.

from Mexico and then conspired to possess the drug with intent to distribute. This evidence likewise supported the appellants' convictions for possession with intent to distribute.

The conspiracy to launder money requires a more detailed analysis, however. In its brief, the government has argued that Rodriguez's conspiracy conviction must be sustained because the appellants paid the informant and undercover officer to transport marijuana. This argument substantially overstates the reach of the money laundering statute. In order to conspire to launder money under 18 U.S.C. § 1956(a)(1)(A)(i), an individual must enter into an agreement whose ultimate purpose is to "promote the carrying on of specified unlawful activity" by conducting a financial transaction using property which involves the known proceeds of specified unlawful activity.[7] Clearly, the mere agreement to pay the informant and undercover officer would not constitute a conspiracy to launder money absent proof that the conspirators contemplated that the "proceeds" used to conduct the transaction would be derived from unlawful activity. In fact, Rodriguez attempts to make this very argument in his brief.

---

[7] 18 U.S.C. § 1956(a)(1)(A)(i) defines the crime of money laundering in the following fashion,

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts . . . a financial transaction which in fact involves the proceeds of specified unlawful activity -- with the intent to promote the carrying on of specified unlawful activity . . . .

18 U.S.C. § 1956(h) makes a conspiracy to commit an offense under § 1956(a)(1)(A)(i) a crime.

Rodriguez's conviction for conspiring to launder money rests, however, on sufficient proof on a narrower basis. The evidence submitted to the jury demonstrated that the appellants were engaged in a broad conspiracy to import marijuana from Mexico to Chicago. In order to promote the narcotics conspiracy, the appellants engaged the services of the informant and the undercover officer to transport the marijuana from Texas to Illinois. To pay for these services, the appellants purchased money orders in Chicago and wired funds from Mexico to Brownsville, Texas. As the government explained at oral argument and in its closing jury argument, a jury could find based on circumstantial evidence that the appellants had used the proceeds of unlawful activities occurring in Chicago and Mexico (i.e., funds procured through participation in felony narcotics violations) to promote an unlawful activity (i.e., conspiring to import and distribute marijuana) by conducting a financial transaction (i.e., purchasing money orders and wiring funds). Rodriguez knowingly participated in a conspiracy that included money laundering to further the defendants' importation scheme. See United States v. Garcia Abrego, 141 F.3d 142, 163 (5th Cir. 1998) (defining elements of money laundering conspiracy) (citing United States v. Conley, 37 F.3d 970, 976-77 (3d Cir. 1994)).

B. *Motions to Sever*

This court reviews the denial of a motion to sever for an abuse of discretion. See United States v. Neal, 27 F.3d 1035, 1045 (5th Cir. 1994). In conducting this examination, the court must

consider the general rule "that persons indicted together should be tried together, especially in conspiracy cases." Id. (citing United States v. Pofahl, 990 F.2d 1456, 1483 (5th Cir. 1993)). A severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539, 113 S. Ct. 933, 938 (1993); see also United States v. Buckhalter, 986 F.2d 875, 876 (5th Cir. 1993) (requiring severance only when specific, compelling prejudice outweighs interest in judicial economy).

### 1. Otero

The trial court did not abuse its discretion in denying Otero's motion to sever. Otero principally argued that severance was warranted in this case because a joint trial would deprive him of exculpatory evidence.[8] Otero maintained that Andrade would waive his Fifth Amendment rights at Otero's severed trial and would testify that Otero had no knowledge of the conspiracy. During the pretrial conference, however, Andrade confirmed that he would not waive his Fifth Amendment rights. Based on this refusal, the trial court denied Otero's motion to sever. Nonetheless, the district court admitted a statement into evidence, allegedly written by

---

[8] Otero asserts in a footnote to his brief that severance was also warranted to avoid presenting a case too factually and legally complex for a jury to comprehend. The evidence presented, however, was similar to that in any multi-defendant, multi-count drug conspiracy indictment -- severance was not required based on alleged complexity.

Andrade, which proclaimed that Otero was not involved in the conspiracy. In this way, Otero was neither deprived of Andrade's testimony nor denied admission of potentially exculpatory evidence. Otero was not entitled to a separate trial.

2. Rodriguez and Andrade

This court will not review the merits of Rodriguez's and Andrade's arguments. The record excerpts filed by Andrade do not indicate that a motion to sever was filed on his behalf in the trial court. Thus, Andrade waived his right to pursue severance. See United States v. Palmer, 122 F.3d 215, 220 (5th Cir. 1997) (citing United States v. Castillo, 77 F.3d 1480, 1490 n.19 (5th Cir. 1996)).

Rodriguez has failed to point out any properly filed motion to sever in the record, and the docket sheet does not indicate that a written motion to sever was filed, although it identifies the government's response to such a motion. Based on the deficiency in the record, attributable to Rodriguez, we need not consider this issue. See United States v. Hinojosa, 958 F.2d 624, 632-33 (5th Cir. 1992). Moreover, based on the government's trial briefing and the transcripts of pretrial proceedings, it appears that Rodriguez changed the basis for his motion to sever on appeal -- arguing below that severance of defendants was required under Fed. R. Crim. P. 14, yet maintaining on appeal that severance of offenses was necessary pursuant to Fed. R. Crim. P. 8(a).[9]

---

[9] The following perfunctory colloquy appears in pretrial proceedings:

Under all of these circumstances, Rodriguez waived the severance

grounds he now asserts.  See United States v. Brown, 16 F.3d 423,

428-29 (D.C. Cir. 1994) (finding waiver of Rule 8 relief when

| | |
|---|---|
| Rodriguez's Attorney: | I have a motion to sever, your honor. [M]y only basis for that is there are three defendants in this case. * * * |
| The Court: | It will be prejudicial is what you are saying? |
| Rodriguez's Attorney: | Yes, your honor. |
| The Court: | Any other grounds? |
| Rodriguez's Attorney: | No, your honor. |
| The Court: | It will be denied. |

This exchange indicates that Rodriguez in fact relied on Rule 14 as
the basis for his pretrial motion to sever.

If this discussion constitutes the sole basis for his
motion, Rodriguez failed to proffer sufficient evidence to
demonstrate a compelling and specific justification for severance
under Rule 14.  Accordingly, the record would not support a finding
that the trial court abused its discretion.  Moreover, plain error
review of Rodriguez's Rule 8(a) argument also fails to persuade the
court that severance was required.  The charged offenses clearly
formed "two or more acts or transactions . . . constituting parts
of a common scheme" and, thus, were joined properly in the
indictment.  Fed. R. Crim. P. 8(a).

**10**

appellant failed to assert the issue pretrial, though proper Rule 14 motion had been made).

C.   *Motion to Suppress*

A federal agent may not prosecute a defendant by using evidence obtained by state officers in violation of the federal Constitution.  See Elkins v. United States, 364 U.S. 206, 223-24, 80 S. Ct. 1437, 1447 (1960) (rejecting "silver platter" doctrine); see also United States v. Eastland, 989 F.2d 760, 765-66 (5th Cir. 1993).   In Eastland, this court refused to extend the Elkins principle to evidence obtained in violation of a state statute or constitution, so long as the seizure did not violate the Constitution.  See Eastland, 989 F.2d at 765-66.  Under the Fourth Amendment, a conversation may be recorded as long as one party to the conversation has consented to the taping.  See United States v. White, 401 U.S. 745, 749, 91 S. Ct. 1122, 1125 (1971); United States v. Gorel, 622 F.2d 100, 106 (5th Cir. 1979).  The recordings in this case were each made with the consent of a participant, the undercover officer or the informant, and, thus, did not violate the Constitution.[10]   Accordingly, the trial court did not err by admitting the tapes or by refusing to instruct the jury on inapplicable Illinois law.  See Eastland, 989 F.2d at 765-66.

D. *Admission of Andrade's Address Books*

The admission of Andrade's address books is reviewed for an abuse of discretion.  See United States v. Brito, 136 F.3d 397,

---

[10]   It follows from this discussion that we take no position on whether the tape recordings violated Illinois law, as appellants contend.

**11**

412 (5th Cir. 1998). Andrade's counsel objected to the admission of the address books for lack of foundation and hearsay. In response to the objections, the trial court asked the Illinois state trooper when and where the evidence had been seized. The officer responded that the address books were taken from Andrade when he was arrested. Thus, the trial court could have concluded, based on the seizure of the address books from Andrade, that the books were his property and that the writing therein was his. Under these circumstances, the address books were properly admissible under the exception to the hearsay rule for admissions of a party opponent. See Fed. R. Evid. 801(d)(2)(A). Even if the address books were not admissible, the ruling would amount to harmless error, as substantial record evidence of Andrade's guilt existed without the address books. See United States v. Gadison, 8 F.3d 186, 192 (5th Cir. 1993).

   *E.    Improper Comments During Closing Argument*

       During the government's closing argument, a prosecutor commented on an objection Andrade's attorney had made to the admission of a police report. Andrade objected to the statement. The objection was overruled and counsel's request to instruct the jury that the prosecutor's remark constituted an attack on the office of defense counsel was denied. The district court, however, did admonish the jurors, "Remember my instructions. You are to consider the evidence that has been admitted during the course of the trial. That's a legal matter before me." Based on the trial court's curative instruction, the limited prejudicial effect the

lone statement may have had on the jury, and the substantial evidence of Andrade's guilt, the trial court's decision not to offer a more detailed curative instruction and not to grant a mistrial does not cast serious doubt on the jury's verdict. See United States v. Andrews, 22 F.3d 1328, 1341 (5th Cir. 1994) (reversing verdict only proper when prosecutor's remarks "cast serious doubts on the correctness of the jury's verdict"); see also United States v. Anchondo-Sandoval, 910 F.2d 1234, 1237 (5th Cir. 1990) (setting forth factors to be considered).

*F.    The Jury Instructions*

Andrade maintains that a more specific perjury instruction should have been given in light of the undercover officer's testimony that it would be acceptable to deceive in order to garner a conviction. See, e.g., United States v. Partin, 493 F.2d 750, 760-62 (5th Cir. 1974) (requiring specific perjury instruction when evidence showed that witnesses essential to the government's case were convicted felons and admitted perjurers). The trial court's admonitions to the jury appropriately instructed the jurors as to their role in weighing the credibility of a witness's testimony, and the instructions correctly informed the jury that it could believe any or all of a witness's testimony.

Andrade's argument, moreover, borders on the frivolous. The undercover officer in this case was not a felon or perjurer. In fact, his remarks concerning the propriety of deception arose in the context of several questions about his role in the undercover operation, not with respect to his testimony. The trial court's

**13**

substantively correct charge to the jury did not deprive Andrade of any defense or argument, and thus, the trial court did not err in rejecting Andrade's proffered instructions.  See United States v. Pipkin, 114 F.3d 528, 535 (5th Cir. 1997); see also United States v. Asibor, 109 F.3d 1023, 1034 (5th Cir. 1997).

Next, Andrade challenges the trial court's alleged failure to instruct the jury that a mere buyer/seller relationship was insufficient to support a conspiracy conviction and the court's refusal to give the jurors a copy of the written charge for use during deliberations.  So long as the general conspiracy charge accurately reflects the law, this court does not require a specific instruction regarding the insufficiency of a buyer/seller relationship.  See Asibor, 109 F.3d at 1034-35 (citing United States v. Maseratti, 1 F.3d 330, 336 (5th Cir. 1993)).  As such, the trial court did not err by refusing to give the proffered instruction.  Moreover, the court did not abuse its discretion by failing to give a written copy of the charge to jurors for use during deliberations.  Cf. United States v. Sotelo, 97 F.3d 782, 787-88, 792-93 (5th Cir. 1996) (finding trial court did not abuse discretion by refusing to give jurors a copy of written charge in multi-defendant, multi-charge drug conspiracy indictment).

*G.    Sentencing*

1.    Rodriguez

Rodriguez maintains that the district court committed clear error at sentencing by attributing 1,200 pounds of marijuana to the conspiracy.  See United States v. Carreon, 11 F.3d 1225,

**14**

1230, 1231 n.17 (5th Cir. 1994) (factual findings regarding drug amounts reviewed for clear error).  Although Rodriguez argues that only the August 30 load of marijuana should be attributed to him for sentencing purposes, the testimony of the confidential informant clearly shows that Rodriguez's involvement in the conspiracy extended to the August 29 load -- the initial delivery point for the August 29 load was Rodriguez's grocery store. Moreover, Rodriguez's participation in the entire importation and possession conspiracy is readily apparent from the record.  Thus, the trial court did not clearly err when it attributed the entire 1,200 pounds of marijuana to Rodriguez.

    2.    Andrade

    The trial court's finding that Andrade played a leadership role in the conspiracy under U.S. Sentencing Guidelines Manual § 3B1.1(c) is also subject to clear error review.  See United States v. Rivas, 99 F.3d 170, 176 (5th Cir. 1996).  Andrade negotiated a price for the transport, developed plans for loading and delivering the marijuana, paid deposits on the $50,000 fee, and, ultimately, accepted delivery of the marijuana in Chicago. Based on his dominant position in the conspiracy at every stage of the crime, the trial court's two point adjustment of Andrade's sentence level did not constitute clear error.

## III. CONCLUSION

For the foregoing reasons, this court affirms the convictions and sentences of each of the appellants.

**AFFIRMED.**